*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered: January 12, 2017        520159
_____

In the Matter of LILLIAN SS.
   and Another, Alleged to be
   Neglected Children.

ULSTER COUNTY DEPARTMENT OF
   SOCIAL SERVICES,
               Respondent;

BRIAN SS.,
               Appellant.

(Proceeding No. 1.)
_____      MEMORANDUM AND ORDER

In the Matter of LILLIAN SS.
   and Another, Alleged to be
   Neglected Children.

ULSTER COUNTY DEPARTMENT OF
   SOCIAL SERVICES,
               Respondent;

KERI SS.,
               Appellant.

(Proceeding No. 2.)
_____

Calendar Date: November 15, 2016

Before: Garry, J.P., Egan Jr., Devine, Clark and Mulvey, JJ.

_____

    Betty J. Potenza, Highland, for Brian SS., appellant.

    John A. Cirando, Syracuse, for Keri SS., appellant.

Heather D. Harp, Ulster County Department of Social Services, Kingston, for respondent.

Daniel Gartenstein, Kingston, attorney for the child.

Marian B. Cocose, Bearsville, attorney for the child.

_____

Egan Jr., J.

Appeals from two orders of the Family Court of Ulster County (McGinty, J.), entered November 6, 2014, which, among other things, granted petitioner's applications, in two proceedings pursuant to Family Ct Act article 10, to adjudicate the subject children to be neglected.

Respondent Brian SS. (hereinafter the father) is the biological father of Lillian SS. (born in 2010) and the stepfather of Lee TT. (born in 1997), and respondent Keri SS. is the biological mother of both children. In 1996, the father was convicted in North Carolina upon his plea of guilty of the crimes of taking indecent liberties with a child and crimes against nature after placing his penis in the mouth of his then two-year-old daughter. While on probation for those offenses, defendant was charged with raping his girlfriend's 18-month-old daughter and, in 1999, he entered an Alford plea to the crime of taking indecent liberties with a child. The father subsequently relocated to New York and, in March 2012, was classified as a risk level three sex offender.[1]

In June 2012, Family Court (Mizel, J.) granted petitioner's application for temporary orders of protection prohibiting the father from having any contact with the subject children and

_____

[1] During the course of the risk classification hearing, the father denied having committed any sex offenses — contending that he "made up [the] story" underlying the 1996 conviction and that the 1999 conviction stemmed from a simple probation violation.

directing the mother to comply with the terms thereof.[2]  That
same month, petitioner separately commenced these proceedings –
one against the mother, the other against the father – alleging
that each parent had neglected the subject children.  Following a
lengthy fact-finding hearing, Family Court (McGinty, J.)
adjudicated the subject children to be neglected – citing the
father's "adamant and categorical denial of his prior sex
offenses" and his corresponding failure to complete sex offender
treatment and, as to the mother, her decision to "turn[] a blind
eye" to the father's offenses and to "[choose] her relationship
with [the father] over the safety of her children."  The father
thereafter appealed from Family Court's fact-finding order, and
this Court affirmed (118 AD3d 1079 [2014], lv dismissed 24 NY3d
936 [2014]).

In anticipation of the ensuing dispositional hearing,
petitioner proposed written terms and conditions for an order of
supervision, to which the mother consented.[3]  The father objected
to the proposed order of supervision, and Family Court proceeded
to conduct a dispositional hearing in that regard.  At the
conclusion of the lengthy hearing that followed, Family Court,
among other things, released the children to the mother's custody
subject to various terms and conditions.  Noting the father's
persistent denial of his sex offenses, Family Court further
concluded that it would be in the children's best interests to
suspend all visitation between the father and Lillian pending
further order of the court and to limit the father's contact with
Lee to supervised telephone access.[4]  The mother and the father

---

[2]  The orders of protection were extended several times
throughout the course of these proceedings, but certain of those
subsequent orders afforded the father either supervised
visitation with the children or supervised telephone or Skype
contact with Lee.

[3]  Counsel for the mother indicated, however, that she would
like to see more visitation between the father and the children.

[4]  Inasmuch as Lee reached the age of majority during the
pendency of this appeal, Family Court no longer has jurisdiction

each appeal from Family Court's individual dispositional orders.[5]

    We begin with the mother's challenge to Family Court's finding that she neglected the subject children. "The case law makes clear that a child may be adjudicated to be neglected within the meaning of Family Ct Act § 1012 (f) (i) when a parent knew or should have known of circumstances which required action in order to avoid actual or potential impairment of the child and failed to act accordingly. Determining whether a parent exercises the requisite minimum degree of care is evaluated by asking whether, under the circumstances, a reasonable and prudent parent would have so acted. In this regard, a finding of neglect does not require actual injury or impairment, but only an imminent threat that such injury or impairment may result" (Matter of Warren RR. [Brittany Q.], 143 AD3d 1072, 1076 [2016] [internal quotation marks and citations omitted]; see Matter of Evelyn EE. v Ayesha FF., 143 AD3d 1120, 1125 [2016]; Matter of Emmett RR. [Scott RR.], 134 AD3d 1189, 1190-1191 [2015]).

_____

over any custody or visitation issues relative to him (see Matter of Roth v Messina, 116 AD3d 1257, 1258 n 2 [2014]) but, in light of the consequences that could flow therefrom, the mother's challenge to the adjudication of neglect as to that child remains properly before us (cf. Matter of Shay-Nah FF. [Theresa GG.], 106 AD3d 1398, 1399 n 1 [2013], lv denied 21 NY3d 863 [2013]).

[5]  The mother's and the father's requests for a stay pending appeal were denied by a Justice of this Court. Additionally, during the pendency of these appeals, petitioner commenced separate proceedings against the mother and the father, alleging that each of them had violated various provisions of the respective dispositional orders. Neither the mother nor the father appeared at the scheduled fact-finding hearing and, at the conclusion thereof, Family Court, among other things, found the parents to be in willful violation of the prior dispositional orders, committed each of them to the Ulster County Jail for a period of six months and continued their placement under the supervision of petitioner until April 19, 2017.

As the record before us reflects, the mother steadfastly refused to believe that the father had committed the sex offenses underlying his North Carolina convictions; she accepted – without question – the father's initial explanations regarding those offenses and, even after learning the true nature of the father's 1999 conviction, failed to inquire as to the details thereof, refused to "believe that he was guilty" of any sexual offense involving a child and acknowledged that there "[p]robably [was] not" anything that would make her change her opinion on that point. Although the mother testified that, in light of the father's past, a decision was made that she would be a stay-at-home mom in order to provide a "safety net" for the children, she also testified that she would be "comfortable" permitting the father to have unsupervised contact with Lillian (who at the time of the fact-finding hearing was less than three years old) and had no fears about the father being left alone with the children – again insisting that he was not guilty of the crimes of which he had been convicted. As to the need for the father to undergo sex offender treatment, the mother was indifferent; the father previously had advised the mother that he had completed whatever treatment was required of him during his incarceration and the mother believed him – even though she subsequently discovered that the facility where the father had been incarcerated did not offer sex offender treatment.

Aside from the father's vague and self-serving testimony that he participated in what he assumed was sex offender treatment while in prison, the record is bereft of any proof that he actually completed an appropriate sex offender treatment program and, as such, there is ample support for Family Court's finding that the father "posed an actual danger to the [subject] children" – a danger or imminent threat that the mother, in turn, either refused to acknowledge or chose to ignore. Simply put, in light of the mother's unwillingness to appreciate the risk of harm posed by the father's presence in her household, especially with respect to her infant daughter, we have no quarrel with Family Court's finding that the mother neglected the subject children (see Matter of Warren RR. [Brittany Q.], 143 AD3d at 1076; Matter of Cashmere S. [Rinell S.], 125 AD3d 543, 544 [2015], lv denied 26 NY3d 909 [2015]; see also Matter of Destiny EE. [Karen FF.], 90 AD3d 1437, 1443-1444 [2011], lv dismissed 19

NY3d 856 [2012]).[6]

We turn now to the father's claim that he was denied the right to counsel during the course of the dispositional hearing, which commenced on April 3, 2013. On the fourth day of the hearing (September 25, 2013), the father rested his case and the hearing was adjourned pending testimony from an expert retained by the attorney for the child. When the hearing reconvened on February 28, 2014, the father filed a "motion to reconsider and vacate" seeking, among other things, to compel Family Court to recuse itself from these proceedings and indicating that the legal services provided by assigned counsel, who had represented the father throughout the course of the fact-finding and dispositional hearings, "no longer [were] needed." Upon inquiry by Family Court, the father indicated that he was requesting the appointment of new counsel or, alternatively, an adjournment to afford him sufficient time to find another attorney. Family Court denied the father's requests as untimely, noting that he had ample time in advance of the hearing date to seek the requested adjournment or to discharge assigned counsel and obtain another attorney. When the father refused to go forward with assigned counsel, Family Court — after cautioning the father on the perils of proceeding pro se — continued the hearing with assigned counsel serving as a legal advisor to the father. In so doing, the father now argues, Family Court denied him his right

─────────────

    [6] In reaching this result, we are mindful that, given the testimony adduced at the fact-finding hearing, the finding of neglect as to Lee necessarily is derivative in nature. The case law makes clear, however, that "evidence of the abuse of one child can suffice to establish derivative abuse or neglect when the conduct at issue evidences fundamental flaws in the respondent's understanding of the duties of parenthood so profound as to place any child in his or her care at substantial risk of harm" (Matter of Joanne II. [Thomas II.], 100 AD3d 1204, 1205 [2012] [internal quotation marks, brackets and citations omitted]). In light of the mother's entrenched denial of the father's offenses, we are satisfied that this standard was met here and, as such, a finding of derivative neglect as to Lee is warranted.

to counsel.  We disagree.

"While a respondent in an abuse and neglect proceeding has a right to counsel, including the right to have counsel assigned if indigent, there is no right to have assigned counsel of one's choice" (Matter of Ashley D., 268 AD2d 803, 805 [2000] [citations omitted], lv denied 94 NY2d 763 [2000]; see Matter of Daniel K.L. [Shaquanna L.], 138 AD3d 743, 745 [2016]; cf. Matter of Zulme v Maehrlein, 133 AD3d 608, 609 [2015]; Matter of Ryan v Alexander, 133 AD3d 605, 607 [2015]; Matter of DeMichiel v DeMichiel, 66 AD3d 894, 895 [2009], lv denied 14 NY3d 704 [2010]).  To that end, "[a]n indigent party is entitled to new assigned counsel only upon a showing of good cause for substitution" (Matter of Daniel K.L. [Shaquanna L.], 138 AD3d at 745; see Matter of Blake T.L. [Robert L.], 141 AD3d 525, 526 [2016], lvs denied 28 NY3d 906, 907 [2016]; Matter of Zulme v Maehrlein, 133 AD3d at 609; Matter of Brendan N. [Arthur N.], 79 AD3d 1175, 1178 [2010], lv dismissed 14 NY3d 934 [2010], lvs denied 15 NY3d 701 [2010], 16 NY3d 702, 735 [2011]).  "In determining whether good cause exists, a trial court must consider the timing of the . . . request, its effect on the progress of the case and whether present counsel will likely provide . . . meaningful assistance. Good cause determinations are necessarily case-specific and therefore fall within the discretion of the trial court" (People v Linares, 2 NY3d 507, 510 [2004]; see People v Orminski, 108 AD3d 864, 865 [2013], lv denied 22 NY3d 958 [2013]).  Notably, "[s]ubstitution of counsel is an instrument designed to remedy meaningful impairments to effective representation, not to reward truculence with delay" (People v Linares, 2 NY3d at 512).  For that reason, when confronted with a request to change retained or assigned counsel, the trial court must insure that such request "does not serve to delay or obstruct the . . . proceedings" (People v Orminski, 108 AD3d at 865 [internal quotation marks and citation omitted]).

Here, despite having had — quite literally — months within which to request substitute counsel, the father, who already had rested his case, waited until the morning of the long-scheduled dispositional hearing — then in its fifth day — to express his dissatisfaction with assigned counsel's services and ask for a new attorney.  The timeliness of the father's request aside, a

review of both his written motion and his colloquy with Family Court reveals nothing more than a generalized dissatisfaction with the manner in which the proceedings were progressing. Indeed, when questioned as to his issues with assigned counsel, the father vaguely replied, "There [are] just too many problems between us." Having failed to raise any serious concerns regarding either counsel's performance or the father's ability to effectively communicate with him, Family Court quite properly concluded that the father did not demonstrate the good cause required to warrant the substitution of assigned counsel (see Matter of Ashley JJ., 226 AD2d 783, 785 [1996]).

We reach a similar conclusion with respect to the denial of the father's request for an adjournment. Although Family Ct Act § 1048 (a) permits the court to adjourn a dispositional hearing "for good cause shown," such determination lies within "the sound discretion of the hearing court upon a balanced consideration of all relevant factors" (Matter of Natalia T. [Michael T.], 115 AD3d 966, 966 [2014]). Here, given the length of time that elapsed between the scheduled hearing dates, the father's corresponding failure to seek an adjournment — or attempt to obtain new counsel — in a timely fashion and the absence of good cause for the substitution of counsel in the first instance, we cannot say that Family Court abused its discretion in denying the father's request for an adjournment (see Matter of Sara KK., 226 AD2d 766, 767 [1996], lv denied 88 NY2d 808 [1996]; compare Matter of Stephen L., 2 AD3d 1229, 1231-1232 [2003]).

Having concluded that the father's requests for an adjournment and/or substitute counsel were properly denied, we are left to consider whether the father's de facto decision to proceed pro se constituted a knowing, intelligent and voluntary waiver of the right to counsel. To be sure, the father did not unequivocally express a desire to proceed pro se; he did, however, make clear that he did not wish to go forward with assigned counsel — even in an advisory capacity — and, when questioned as to his desire to proceed pro se, the father refused

to answer Family Court directly,[7] insisting instead that he be given time to obtain counsel of his own choosing. The hearing proceeded as scheduled, with the father representing himself and assigned counsel acting as his legal advisor. At the conclusion of the February 2014 hearing, Family Court reminded the father to advise the court should he elect to retain counsel in advance of the next scheduled hearing date but, when the father returned to court for that hearing two months later, he continued to represent himself – with assigned counsel standing by as a legal advisor.

While Family Court arguably could have conducted a more detailed inquiry, the court was faced with a recalcitrant parent who steadfastly refused to accept either of the reasonable options available to him, i.e., to continue with assigned counsel or to affirmatively respond to Family Court's repeated inquiries as to his desire to proceed pro se, opting instead to attempt to delay the already protracted proceedings by demanding that he be assigned counsel of his choosing. Further, Family Court was not required to follow a specific formula in ascertaining the voluntariness of the father's decision to proceed pro se; rather, the record need only "demonstrate that the [father] was aware of the dangers and disadvantages of proceeding without counsel" (Matter of Ryan v Alexander, 133 AD3d at 606 [internal quotation marks and citations omitted]; see Matter of Graham v Rawley, 140 AD3d 765, 767 [2016], lv dismissed and denied 28 NY3d 955 [2016]) and that he was competent to make that decision (see Matter of Graham v Rawley, 140 AD3d at 767). Upon reviewing the colloquy between the father and Family Court on this point, wherein Family Court apprised the father of the perils and pitfalls of proceeding pro se, we are satisfied that the father knowingly, intelligently and voluntarily waived his right to counsel.

---

[7]   Contrary to the representations made by counsel during oral argument, the father did not repeatedly refuse to proceed pro se. Rather, the father refused to choose between proceeding with assigned counsel or proceeding pro se – opting instead to continue to insist that he be provided with counsel of his own choosing.

Of the remaining arguments raised by respondents, only two warrant discussion. As to the specific terms of the dispositional order, the father contends that Family Court abused its discretion in denying him contact with Lillian pending further order of the court. Again, we disagree. "The dispositional order must reflect a resolution consistent with the best interests of the child[] after consideration of all relevant facts and circumstances, and must be supported by a sound and substantial basis in the record" (Matter of Alaina E., 33 AD3d 1084, 1087 [2006] [citations omitted]). To that end, "whether visitation is appropriate is a matter left to Family Court's sound discretion and its findings, to which deference is to be accorded, will not be disturbed on appeal unless they lack a sound basis in the record. While denial of visitation to a biological parent must be based on compelling reasons and substantial evidence that such visitation would be detrimental or harmful to the child's welfare, the rights of a parent are subordinate to the policy of protecting a child from a parent who is incapable or unwilling to perform his or her parental responsibilities. Accordingly, the paramount issue in determining whether visitation should be permitted by a parent who has committed neglect is the best interests of the child[], and an inquiry into the child['s] best interests involves consideration of . . . any potential threat of future abuse or neglect" (Matter of Hobb Y., 56 AD3d 998, 999 [2008] [internal quotation marks, brackets, ellipsis and citations omitted]; see Matter of Duane FF. [Harley GG.], 135 AD3d 1093, 1094-1095 [2016], lv denied 27 NY3d 904 [2016]; Matter of Telsa Z. [Denise Z.], 90 AD3d 1193, 1194 [2011], lv denied 18 NY3d 806 [2012]).

Here, the attorney for the child called Rebecca Arp, a licensed psychologist, to testify at the dispositional hearing. After reviewing the mother's and the father's trial testimony, together with various test results, assessments and evaluations, Arp was of the view that the father was "at a moderate risk of offending, of recidivisim" and that he required sex offender treatment; without such treatment, Arp opined, the father lacked any awareness of "his triggers or his offense cycle" or any concept of "safety planning" and, as such, continued to pose "a danger to prepubescent girls." Specifically, Arp testified that, given the father's history of sex offenses with infant girls and

his persistent denial of his conduct, she would have serious concerns regarding the father's risk of offending against Lillian.[8] Such testimony, in our view, fully supports Family Court's finding that visitation between the father and Lillian would not be in the child's best interests. To the extent that Christopher Farrell, the clinical coordinator of sex offender services for the Ulster County Probation Department, offered testimony to the contrary, any conflict in the testimony presented a factual and credibility issue for Family Court to resolve (see generally Matter of Shana SS. v Jeremy TT., 111 AD3d 1090, 1092 [2013], lv denied 22 NY3d 862 [2014]).

We do, however, find merit to the mother's claim that a specific provision in the dispositional order — requiring her to reside in Ulster County — is invalid as no such requirement was embodied in Family Court's written decision. "[A] written order must conform strictly to the court's decision, and . . . when there is a conflict between the two, the decision controls" (Zebrowski v Zebrowski, 28 AD3d 883, 884 [2006] [internal quotation marks and citations omitted]). Here, Family Court's written decision following the dispositional hearing does not include any requirement that the mother and Lillian reside in Ulster County — indeed, the residency requirement was not included in the proposed terms and conditions of supervision to which the mother consented, and a review of the hearing transcript reflects that petitioner was well aware that supervision of the mother would be undertaken by an agency in the county in which the mother then was residing.[9] Accordingly,

_____

[8] When questioned as to the possibility of supervised visitation for the father, Arp testified that such supervision should be provided by an appropriate agency or someone who, in addition to being able to be objective, had been trained to look for certain red flags — such as whispering or lap sitting during visits. According to Arp, the mother would not be an appropriate supervisor for such visits "given her level of denial."

[9] Counsel for the respective parties advised this Court at oral argument that neither the mother nor the father currently reside in New York — much less in Ulster County. According to

Family Court's dispositional order entered with regard to the mother must be modified accordingly.  Respondents' remaining contentions, including their respective ineffective assistance of counsel claims, have been examined and found to be lacking in merit.

Garry, J.P., Devine, Clark and Mulvey, JJ., concur.


ORDERED that the order entered November 6, 2014 with regard to respondent Brian SS. is affirmed, without costs.

ORDERED that the order entered November 6, 2014 with regard to respondent Keri SS. is modified, on the law, without costs, by reversing so much thereof as required said respondent to reside in Ulster County with the minor children; such provision is stricken from the subject order; and, as so modified, affirmed.




ENTER:

Robert D. Mayberger
Clerk of the Court




counsel, the mother and the children reside in Pennsylvania, and the father resides in North Carolina.  That said, Family Court retains jurisdiction over these proceedings, and counsel for petitioner indicated that petitioner has retained responsibility for supervising the parents' compliance with the dispositional orders.